We have four cases on the docket today and we'll take a short break after the second case. And I will call the first case, number 21-50915, United States of America v. Ansari. Mr. Gross, you may proceed. Good morning. My name is Michael Gross. I represent the appellant in this case, Merdad Ansari, on this direct appeal from the Western District of Texas, San Antonio Division. With the court's permission, I'd like to orally argue points of error one and two and rely upon my brief for the remaining points of error. I've reserved five minutes for rebuttal. Point of error one, in this case we have an eight-year delay from the day of indictment in June of 2011, which was sealed, to the day of arrest in June of 2019 in the Republic of Georgia by Mr. Ansari, who always lived and worked in Dubai during this period of time. This delay of eight years is extraordinary and attributable to the government, so dismissal is the proper remedy in this case, especially since Mr. Ansari, the government knew from emails from 2008 and 2007, they knew Mr. Ansari's work address in Dubai. Mr. Ansari was a young forwarder, a freight forwarder there in Dubai, and they knew, the government knew from his emails in 2007 that these emails listed his name, his place of business, the actual business, Gulf Gate and Gulf Merchant. And the signature line on these emails also gave not only his work phone number and fax phone number, but his cell phone number. Yet the government did not timely attempt to try to arrest Mr. Ansari. Their thought process in this case was to wait and see and hope that Mr. Ansari would come back to the United States from Dubai. So here's why they thought that. What should the government have done at that point? He's in Dubai. In your view, what should the government have done to effectuate an arrest? So, Judge Duncan, the quick answer to that is the HSI attache in Dubai. The HSI attache in Dubai was not approached by the government until June 2013, and they gave the HSI in Dubai that information from the emails that I just told you. And within two weeks, within two weeks, HSI Dubai informed the government that Mr. Ansari's full legal name was Mehrdad Mowain Ansari. And so you see on the pleadings in this case, it's Mehrdad Ansari. However, HSI Dubai attache found in two weeks that his full legal name was Mehrdad Mowain Ansari. Now, why is that important? Because in October of 2012, Mr. Ansari, who I said is a freight forwarder, wanted to come to the United States for the first time and attend a conference for freight forwarders in the United States. And he asked for a B-1 visa to come to the United States from Dubai. In that B-1 visa application, he said that he was born in Tehran, Iran, gave them the information about the fact that he runs Gulfgate and Gulf Merchant, gave them his phone number, the same as was in the emails, gave him the other information regarding Gulfgate and Gulf Merchant. Yet, however, the government didn't have enough information into the NCIC system and into Interpol, for instance, in order to know that this was the Mehrdad Ansari that they were looking for on the arrest warrant that they issued in June. When did he become aware that he had been charged and that the government might be interested in talking to him? A fair reading, Judge Engelhardt, of the facts in this case are that Mr. Ansari had no idea until his arrest in the Republic of Georgia on June 16, 2019. And why do we think that? The reason we think that is the case agent at the detention hearing readily admitted that Mehrdad Moin Ansari is Mr. Ansari's legal name. And in the B-1 visa, he candidly put in he was a freight forwarder, as the government knew from the 2008 emails, and candidly put in there that he runs Gulfgate and Gulf Merchant. What's even more important, though, is he agreed to come to the United States on the B-1 visa to attend that conference, and he didn't change his name. Now, the government says in their briefing that, yes, but in that B-1 visa application, Mr. Ansari did not check the box that asks, have you ever used another name? And so the big question is, is Moin Ansari the same name as Ansari? And it's our position that it was, and that's what came out from the testimony of the case agent at the detention hearing. But even more importantly, Judge Engelhardt, is that Mr. Ansari traveled with a visa and a passport that had his name, Mehrdad Moin Ansari. He traveled to Hamburg, Germany in July and August of 2011. He traveled to Hamburg, Germany again in February 2012. He traveled to Istanbul, Turkey in September 2012. Came to the U.S. in October 2012. Traveled to France in June 2013. Traveled to Spain in August 2013. And traveled to Germany, Austria and Spain from 2015 to 2017. Now, these countries, as we've shown in our briefing, they're part of Interpol. There are a lot of countries there that would say, yes, if we knew about this guy, we would have apprehended him for you and extradited him to the United States for trial. However, what's clear from the case agent's testimony at the detention hearing is the government's position was to wait and see from 2011 to 2017 to see if Mr. Ansari would come to the United States again. And why is that a problem? That's a problem because the government in their briefing, they talk about the red notices and the blue notices with Interpol. And they talk about the diffusions with Interpol. Diffusions where you pick the country wanting the person arrested. They pick which countries get the information so Iran, for instance, would learn about it or something like that. Well, the government claims in their briefing that their case agents and their team, their prosecution team, they didn't know about diffusions that could go to Interpol. Well, that makes no sense. Especially when the key to this whole case on the speedy trial issue is that all they had to do was pick up the phone, call the HSI attache in Dubai, and they would have immediately gotten that information. But even more importantly on the case law, it says, look, this wait and see approach is okay as long as you don't progress into the presumptive prejudicial time period for a speedy trial, which is a year. And so the case law says that we've pointed out in our briefing, look, once you start getting into that one year delay from day of indictment, then you start having some problems and government, you need to reevaluate your situation and decide if it's still prudent to take the wait and see approach. And in this case, it was not prudent because it took eight years then to arrest Mr. Ansari on his case in the Republic of Georgia. And so it's our position that's an eight-year delay and it's tributal to the government. The four factors of Barker, you have the length of delay. Clearly, it's an eight-year span from 2011 to the day of indictment that was sealed and the government chose not to unseal it until after the co-defendant was apprehended. And that was an unreasonable delay in our position, in our argument. When were the co-defendants apprehended, Ms. Yip and Mr. Fumani? When were they apprehended? They're in the same indictment. On Yip? Yes, sir. So Yip, she was arrested in around 2012. The indictment was unsealed after she was sentenced. It was May 2012 when the government lured Yip to the U.S. with the ruse of conducting business with her. It resulted in her guilty plea on October 24, 2012, Your Honor, and then she was sentenced. And then after she was sentenced, a few months later, the indictment was unsealed. Well, at the detention hearing, we asked the case agent, why didn't you do the same with Ansari? Well, we had bigger fish to fry was his answer in so many words. Things came up after we debriefed Yip. It diverted our attention elsewhere, not towards Ansari. And so that's why we kind of used the wait and see, hope he shows up approach. What about the other defendant? Fumani remains at large, Your Honor, in Iran. He remains at large. And the big question, especially at the detention hearings, well, you know, this case law we cite in our brief says, as you get beyond that one-year period, call the guy and let him know there's charges against him. So now you've taken care of the speedy trial problem, the potential speedy trial problem. If they don't come, fine. If they do, you can arrest them and start the case. They never did that in this case. Now, the government in their briefing says, you know, we tried to do a setup similar to Yip, but it was just a perfunctory kind of thing that our position is didn't come close to establishing the type of efforts that the case law we cite in our brief requires, especially after you've passed the one-year period of time. The big question is why not call the Dubai HSI attache right away in 2011, say, look, we've got his e-mail information here, his address and whatnot. We would like you to go over and find out more information about him. Two weeks later, the HSI attache in Dubai gave the government that information. So it's our position these other concerns the government has about we didn't want Iran to find out about it, we didn't want him to find out about it, so we didn't use the blue or red warrant notice with Interpol, and we didn't know about the diffusion. That's all respectfully a red herring because HSI Dubai attache was the key in this case, and they didn't use that until 2013. Point of error two. So. You're going to mention prejudice. Yes, I'm sorry, sir. Barker factors, prejudice. What is your argument on prejudice? So with respect to prejudice, Your Honor, it's our position that the first three Barker factors, the first three, the length of delay, the reason for the delay, you know, the hope, wait and see, and our client diligently asserting his speedy trial rights because he didn't know about any of this until the detention hearing that was in March of 2019, and then we filed his speedy trial motion the very next month. So prejudice, since our argument is all three Barker factors are heavily in our favor, because of the prejudice, we don't have to show actual prejudice. Under the case law like Olina, Solarios, we cited in our brief, Doggett, Cardono, Bergfeld, those cases that we cite in our briefing say, look, it's heavily in your favor on the first three factors. You don't have a duty at that point to prove the prejudice is presumed. The government tried to overdo that with that great language from Doggett that we cited in our brief where impairment of one's defense is the most difficult form of speedy trial, especially when you have a long delay. Doggett had the eight-year delay like we do in this case, and Doggett said, you know, we have to recognize excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. If we were to weigh the first three factors differently, and let's say hypothetically that they didn't weigh quite as heavily as you think in favor of Mr. Ansari, what would be your argument as to prejudice? We would still rely on that language out of Doggett. Here we have a guy, a young guy, fresh out of college, Mr. Ansari, who had started a freight forwarding company in Dubai. He gets arrested in the public of Georgia without any of his possessions from Dubai or anything, and he's extradited from the Republic of Georgia prison to the United States, didn't have any information that he could have used. Just think, I mean, this all happened in 2007, 2008, and so we just didn't have the evidence we needed at trial. We had to rely on the e-mails that the government had. Okay. Thank you. Public trial. So we were the first case, Mark and I, Mr. Rundberg and I, to be tried in San Antonio after COVID. And so it was March 3, 2020. Judge Rodriguez said, you know what, we're going to have this trial. However, the courtroom is going to be closed to the public. We're going to put the jury in the spectator gallery, put the witness in the jury box. We're going to do a feed to another room so the public can see the feed. It's our position that there were not specific findings made by Judge Rodriguez adequate to support the closure in this case. And it's our position it's a total closure. The government's position is it's a partial closure. All that really does is affect the terminology of the first prong, whether it's overriding interest or substantial reason. So it's our position. There is an objection on the record to proceeding in that fashion? Yes, sir. Okay. And also, is there any case law that would support your claim that that's inadequate in terms of satisfying a public trial? So I want to apologize right now. Last night I found a case out of the Ninth Circuit. I want to apologize to the government also. I didn't let you all know. I'm so sorry, but I apologize. I found Allen out of the Ninth Circuit. Well, I assume it's not cited in your brief.  I assume this case you're talking about is not cited in the brief. That's exactly right because it's a few weeks ago. Well, if you'd like to try to file a letter with us. That's perfect, Judge. That's perfect. And give the government the opportunity to respond or object or something. Absolutely. I appreciate that. So my thoughts were, look, you didn't use any other options available. You could get a bigger courtroom. You could use masks. You could find out what the COVID CDC requirements are on spacing. You could use testing. Testing would not end. You're out of time, but you do have time for rebuttal. And we've got your brief on that point. Thank you. Mr. Rundberg. Good morning. Mark Rundberg for the United States. I'd also like to address the first two issues and stand on my brief for the third. When looking at the delay and speedy trial violation, Barker set forth its four prongs to look at. And what prejudice is only presumed, according to Barker and under Doggett, if and only if the government was not diligent in trying to capture the defendant, if the government was negligent or intentional in its delay. In this case, the government was not negligent and not intentional and was diligent in trying to capture this defendant. This court reviews the district court's findings of facts to determine if they're clearly erroneous and reviews de novo its application of the law. In this case, while we're talking about an eight-year delay, the district court found that much of the delay was due to the defendant. In fact, the district court found four years delay, and I would suggest to the court that it was closer to five years when we look at the dates the court cited in its order. The court found the defendant was the delay for the time from the indictment to the time we determined that his passport name, different from his criminal name, was Moeen Ansari. That was 25 months. The court said the time from May 16th, 2017 to June 19th, the time when we applied for the diffusion notice until the time the defendant was captured in Georgia, was 13 months. It's actually 25 months. And then that was also attributable to the defendant, and the... You're saying the district court undercounted those months? The district court undercounted. The district court said 13 months, but set forth the dates May 2017 to June of 2019. It's there in the order. So it was a typo or a math error. And then the nine months the defendant fought extradition while he was in Georgia. So the total was 59 months, just shy of five years. Again, both in Doggett and in cases the defendant cites, if the defendant causes the delay and that slows the process, then that has to be attributable to the defendant, and therefore we can't assume prejudice. That takes us to the reason for the delay, the second Barker prong. The defendant hid his identity by using his criminal name, Ansari, to commit the crime, and then traveling under a passport name of Moeen Ansari. The defendant is a citizen of Iran, an embargoed country, that is trying to circumvent getting technical goods to assist its warfighting ability past the embargo that the United States has put on them. And they have the ability to issue passports under any name. We do not know, yes, he has a passport name under Moeen Ansari, but we don't know for sure is that his real name, or is Ansari his real name, or is it something different? And that comes into play in terms of some of the decisions we made and how we had to capture this defendant, because we knew we could not extradite him from Iran, they would not cooperate. We also knew we couldn't extradite him from UAE because there's no extradition treaty. In July of 2008, HSI put Mr. Ansari's name, Merdad Ansari, into its text system, which tracks people coming in and out of the United States, and the United States only. We have no visibility overseas with travel in other countries under text. The agents also attempted to put, after Yip was sentenced in October of 2012, and we unsealed the indictment, we publicized the indictment and the sentencing, including the defendant's name, which was available over the internet, both nationally and internationally. We attempted to put the defendant's Merdad Ansari name into NICS. Unfortunately, because of the lack of biographical data, it didn't meet the NICS standard. We consulted with the chief of the counterproliferation section in Washington, along with country experts at the Office of International Affairs, to try and determine what we could do internationally to capture the defendant. But because he was an Iranian citizen in the UAE, we couldn't get extradition. If we put out a red or a blue notice, then Iran would know, and they could take steps to protect the person who was trying to help them bust the trade embargo. Unbeknownst to the United States, in July of 2012, the defendant applied for a visa to the United States under the name Merdad Mouin Ansari. And to claim that these are the same names is the same argument as saying the name Smith, and Blacksmith are the same, and that the government databases would know it's the same person. Not only did he lie about what his name was, he also lied that he hadn't used any other names. And despite him going to a trade show, a business event, he didn't use the same email that he used and was entered into text that he used to commit the crime, Merdad Ansari at Gulfgate. He used Merdad MA at Gmail. So again, he intentionally hid his identity from the government, which prevented us from knowing that he came and left the United States in October of 2012. Does his intent in using these different names matter to the analysis? Or, I mean, what if, I'm just hypothetically, what if these are just accepted alternative spellings of a name or something like that? Maybe the record doesn't support that, but does it matter? Or does his intent in using the different names matter to the speedy trial analysis? Yes, Your Honor. If the defendant causes the delay, then under Doggett— Well, the use of different names may have caused the delay. What his intent was, I'd have to look at the record more closely to know that. I think the intent goes to what we can infer that he knew he may be wanted. He knew he was committing crimes against the United States. And I think we can use that. Does it go definitively as much as just using the different names? Perhaps not. I was just curious. Thank you. The district court found that had the defendant not hid his identity when he came to the United States and on his visa application, that he would have been caught back in October of 2012 when he came. We did try to contact the defendant in an undercover capacity so we could attempt to do a lure just like we had done with Yip and what we had been trying to do with Fumani. We inquired with the HSI legal attache and the UAE to see if we could better identify the defendant. And they did tell us that he used the name Murdad Moeen Ansari. And by running checks through text, we determined that he had come to the U.S. some months before. Again, we went to the Office of International Affairs. We discussed it with the chief of the counterproliferation section at OIA. And again, the answers were the same. Because he's Iranian, because he's in the UAE, there's no extradition. If we go with a red notice or a blue notice, Iran would notify or could notify Ansari. And that would, since we now finally had him identified, they could change his passport and then we would lose sight of him. So we determined that we couldn't use a red or blue notice. At this point, no one had heard of the diffusion. It was never mentioned by OIA or the counterproliferation section. We were trying everything we could do. The commerce agent got very creative and said, let's put him on the commerce entities list and all of his companies. Unfortunately, to go through the administrative process, that took from June of 2019 until June of 2016. And we were hoping that because his company was on it, his name was on it, we publicized it again nationally and internationally, that he would come to the table. It never ended up working. But at that point, we went back. FBI actually contacted an Interpol liaison, Department of Justice, and then I spoke to that person. And we learned that while the red notice and the blue notices would not work for the reasons we stated before, there was something called a diffusion. And the diffusion could be sent to select countries. Well, the diffusion was applied for in May of 2017. We got it in October of 2017, and it went to two countries. It went to, well, I'm sorry, it went to Germany, and then it went to Interpol in France to be distributed to countries other than the ones that were kept off the list, which would include UAE and Iran. As we heard, the defendant traveled to Germany after that time period. And despite getting a diffusion notice for whatever reason, whether it was inadvertence or intentional because they didn't agree with the U.S. trade embargo against Iran, Germany didn't execute a provisional arrest war. But we tried everything we could, we tried to be creative, and we never stopped looking for the defendant. Georgia arrested him in June of 2019. And the defendant brings up that we could have sent him a letter, like some of the cases said. We could have invited him to come back. Well, in a sense, we did. When we captured him in Georgia, he could have chosen to waive extradition. Then I think the defendant may have had an argument we could have sent a letter earlier. But he didn't waive extradition. He fought it for nine months up to the Georgian Supreme Court. So the fact that we didn't send him a letter certainly can't be held against us. And this was a time period, again, that the court held against, the district court held against the defendant in terms of the delay. And even as the district court also found out regarding the difficulty in extraditing Iranians in the international arena, even with Georgia a friendly country, we still had to waive money laundering counts because of dual criminality. So international extraditions are challenging, especially when we're dealing with Iranians. The district courts found that the reasons for delay was the defendant lied on his visa application and claimed he did not use another name, the difficulty in extraditing Iranian nationals, and the focus on getting Yip and Foumani. Could you remind me, counsel opposite talked about the government was able to trick Yip or do some sort of sting operation to get Yip to come to the United States. Yes, Your Honor. Why was Yip in a different situation than Ansari with respect to a sting? Why wouldn't a sting have worked with Ansari? The difference comes from Yip responded. Where was Yip? Yip was in Taiwan, and the approach was actually she and her boyfriend had a lighting company, and the undercover agent reached out to her in that capacity. The undercover reached out to the defendant trying to set up a freight forwarding deal, but the defendant never responded, so that's why the lure didn't work for him. Gotcha. Which brings us to the next barker factor, the defendant's assertion of his rights. As the district court found, the defendant did not timely assert his rights. When he was in Georgia and was captured, he did not assert his rights at that point with the United States. In fact, he fought extradition and didn't assert his rights until he got into the United States. And this brings us to the last barker factor, prejudice. Doggett stated that only if the government is negligent or intentional in delaying the capture of the defendant is the defendant relieved of his burden to show prejudice. But the district court found that many periods of the delay were not the fault of the government, that the defendant was not diligent in asserting his rights, that prejudice could not be presumed, and that the defendant failed to show any prejudice, no prejudice in the loss of testimony or in the loss of evidence, or how such absence of this evidence impaired his defense, to the point of fact, not only when the defendant, at the detention hearing, he introduced e-mails from these transactions, some that we later introduced, this was prior to the government ever giving discovery. He had the e-mails with him when he came back to the United States. So he did not show prejudice. He cannot show prejudice. The government used all reasonable and viable methods to try and find and capture the defendant. The government was neither negligent nor intentional in any of the delay, and much of the delay was caused by the defendant himself in hiding his identity during the crime, hiding his identity when he applied for a visa and came to the United States, and never returning to the United States. And the government had to track him down, and we never stopped trying. The defendant failed to show that the district court's findings were clearly erroneous, that the defendant caused his own delay by hiding from the government and the difficulty in extraditing Iranian nationals, and that there was no presumption of prejudice. The district court found the defendant failed to carry his burden to prove prejudice, as is the defendant's burden. There was no speedy trial violation. I'd like to now turn to the partial closure of the courtroom. Because, again, we're not talking about a full closure of the courtroom. We're talking about a partial closure. And as this Court's data in Osborne citing Waller, the standard for a partial closure doesn't carry the same constitutional concerns as when we're talking about a full closure of the courtroom, because the audience remains to ensure fairness of the proceedings. In Cervantes, this Court held that the standard of review was de novo, and that this Court will affirm the lower court if it had substantial reasons for balancing the defendant's and the public's right to trial with its other concerns, in this case, the actual safety of the jurors. The district court gave substantial reasons several times, at the status conference on April 28th, when, prior to jury selection, when the defendant lodged his objection, and in its explanation to the jury to allay their concerns for their own safety. This was the first trial in San Antonio Division since the COVID shutdown in March of 2020. The court sua sponte determined that the jurors had to be socially distanced according to Center for Disease Control and local health authority guidance. The defendant knew of these arrangements on April 28th at the status conference, when he asked the trial to move the trial date up from the current setting of July 26th, in three months, to four days away, on May 3rd. Prior to jury selection, the district court, and this was on May 3rd, the day of trial, explained that he planned to use two different jury veneers that'd be housed in separate large courtrooms and then brought in one at a time in this courtroom so the jurors could be socially distant and maintain their safety. That the trial would be open to the public through a simultaneous audio and video feed to another room in the courthouse to allow the public, spectators, and the press to observe. The defendant timely objected to this procedure. The court stated on the record that he's trying to keep a public trial. But because of COVID restrictions, he needs to physically distance the jury. And that he couldn't physically... Excuse me, do we have cases by now? I mean, this whole closure of the courtroom and all of that from COVID, I mean, that's a while back now when that all started. Are there any cases that talk about what procedures have been used successfully and what have been shot down? No, Your Honor, I haven't seen cases on that. The only cases I've seen that are somewhat similar have to do when you're dealing with, say, a confidential informant whose identity must be protected and they put the witness on the stand and clear the courtroom except for the parties and then do a video audio feed to another room for that. But I've never seen it yet regarding COVID. You haven't had a rash of COVID cases? No. I mean, for courtroom problems? Because God knows every courtroom in the country had the question of what they were going to do about it. So I figured there'd probably been some litigation about it. I have not seen an injection. I'm sorry. You haven't seen one, OK. But the court stated on the record after the defendant objection that the jurors had to be physically distanced, that they couldn't be... that couldn't happen if they were all put in the jury box. And the jurors would have to be put in the spectator area and spread out, and that there be an audio and video feed to the jury assembly room for the spectators, the public, and the press. And to allay the jurors' concerns after that, he told his jury panel all of the steps the court was taking to protect them from COVID. Despite this, the defendant insisted on a trial as soon as possible. The district court used the least intrusive means to preserve the public right to trial, as well as protecting the jury's safety. The court stated substantial reasons for the partial closure, that the jurors needed to be physically distanced, and to protect their health and safety. Remind me of the date, the specific date of the trial. The specific date of the trial was May 3rd. The DACA call was on April 28th. I'm sorry, it's 20... 21... Oh, I'm sorry, 2021. Yes, Your Honor. Just trying to get in my mind, what was going on with COVID at that time. Presumably the analysis would be different if we did a partial closure today. Yes, Your Honor, that is true. The trials are much different today. But in this case, this was the first trial post-COVID shutdown that the court held. So the court and the parties did their best with what they could to both protect the jurors, as well as have a public trial. And we'd ask the court to affirm the district court on this issue.  Mr. Gross, a rebuttal. A few quick thoughts on the speedy trial issue. We put in our brief the Fugitive Disentitlement Doctrine information that says we can't raise anything regarding litigation in the U.S. while we're outside the U.S. For instance, while we were in prison in the Republic of Georgia, we couldn't raise a speedy trial issue until we got back to the United States. When we got back to the United States... In fact, the docket says that we were actually arrested when we got back to the United States March 14th, 2020. We then filed the following month the speedy trial motion. Regarding that B-1 visa application, there's no reason to lie on that application. The government indicated that in oral argument today and in their briefing. No reason to lie on the B-1 application because the indictment was not unsealed until a few weeks after we were in the United States. So if the indictment was sealed when we did the B-1 visa application, we couldn't have known about the charges. Then when it was unsealed, we had already left the United States and were back in Dubai. So there was no reason to lie on the B-1 visa. Regarding the speedy trial, it seems to be that cases that have looked at it without specifying anything, they look to see what the court decided. In other words, is this a complete closure with no video, no audio? Or was it a closure with audio but no visual? Or was it a closure where a certain number of the public were allowed into the courtroom, the rest had to watch it on a video feed in another courtroom? And so the question is, did the judges consider allowing a certain number of public into the courtroom, such as family or visitors or whatnot who wanted to see it, did they consider letting a few people of the public into the courtroom pursuant to CDC guidelines, for instance, things like this number of people will be allowed in the courtroom as long as their temperature is correct, as long as they're masked, and as long as they answer pertinent medical questions? Remind me, were there CDC guidelines with respect to courtrooms? I mean, not that they would bind us, of course, but were there CDC guidelines that spoke to these kinds of issues at the time? And that's the problem in this case, Judge Duncan, is there are no findings specific to that fact. We don't know... These other cases, we talk things like, okay, we know they have to be 6 feet apart. There's no such finding made in this case. The only finding made in this case is that COVID restrictions require the closure of the courtroom. Nowhere in the record does it say what the restrictions were or what needed to be followed with respect to distancing, what needed to be followed with respect to whether a certain number of people from the public could come in or not. That's the big problem, and it's our position that if no specific findings in the record support the conclusion for this closure of the courtroom to the public, then the court can do nothing but reverse and remand for a new trial. What was your argument to the district judge about alternative measures? What did you think should have been done? So the case law is real clear, Your Honor, that we don't have to give alternatives. Well, I was just asking. Yes, sir. Did you say, no, no, we should let 10 people in? Exactly, Judge Duncan. So our position was that we objected to the judge saying the courtroom will be closed, and that's all we did. We objected under the Sixth Amendment to write to a public trial. We didn't offer any alternatives because we didn't hear from the judge what the specific findings were. I was just curious about whether there was kind of a back-and-forth negotiation about different measures. There was not. Frankly, I wasn't even sure if it was a total closure. I asked the judge when we started the trial. I know we had had discussions at the pretrial conference hearing and whatnot, but I wasn't sure if we actually did it. In fact, I quote directly out of the... In the brief, I quote directly out of the record that, Judge, I'm not sure about this, but is it a total closure of the courtroom? He said yes. He had a very short, about three-sentence response. I didn't have any specific findings to say, well, Judge, if you're concerned about the size of the courtroom, which we don't know what it is on the record, or what was available on bigger courtrooms, if he said, well, I'm concerned about spacing, I would have said, well, let's get a bigger courtroom, let's try this case down in the central jury room or something like that to give us more space, but since I didn't know what the judge's concerns were because there weren't any specific findings, I didn't know what to offer. Judge King asked your opposing counsel about are there COVID cases on courtroom closures, Sixth Amendment cases. Are there? Yes, sir. What are the precedents saying? So as an example out of the Ninth Circuit, they are saying that in one case I read, it was audio only, not visual, no people allowed in the courtroom at all. That case a few weeks ago out of the Ninth Circuit said basically, look, we have a concern because the judge didn't look into the specific facts of what the spacing should be and didn't look at alternatives like allowing a certain number in the courtroom. We'll review the cases, but thank you, counsel, for your argument. The case is under submission. Thank you. It wouldn't hurt if the lawyers, each of you, might do a little checkup and see whether there's some law that's evolving on this I mean, this is not, it's been a while now, there should be some cases. Should be something. That's exactly right, Your Honor. Okay, so file supplemental letter briefs, you know, 10 days, see if you can't find a little law. Wouldn't hurt. A little law is always helpful. Yeah. And I'll do that week, Your Honor. Thank you. Thank you.